IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION


EL DORADO CHEMICAL COMPANY                                              PLAINTIFF


VS.                             CASE NO. 1:11-CV-1059


UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY;
LISA P. JACKSON, Administrator,
United States Environmental Protection Agency; and
AL ARMENDARIZ, Regional Administrator,
United States Environmental Protection Agency Region 6                  DEFENDANTS


## ORDER

Before the Court are the parties' cross motions for summary judgment. (ECF No's 21 & 40). Both parties ask the Court to grant judgment as matter of law upon review of an administrative decision by the United States Environmental Protection Agency ("EPA"). Each party has responded to the other's motion, and each has filed a reply. (ECF No's 38, 42, 46, & 49). The matter is ripe for the Court's consideration. Because this case concerns EPA action within its own sphere of expertise, and its decision is supportable on a rational basis, the Court grants summary judgment in Defendants' favor.

## BACKGROUND

This action involves a complex water dispute between a chemical company and EPA. In 2006, El Dorado Chemical Company ("EDCC") submitted a proposal to EPA to make certain changes to Arkansas' water quality standards. EPA denied that proposal, which left EDCC in violation of the existing standards. EDCC now seeks review of that decision under the Administrative Procedures Act asking the Court to declare EPA's decision arbitrary, capricious,

and inconsistent with the law. EDCC asserts that EPA's decision was unprecedented. EPA, however, contends that a rational connection exists between the facts in the administrative record and its final determination and that its decision is entitled to deference.

EDCC operates a chemical manufacturing facility in El Dorado, Arkansas, where it discharges certain levels of dissolved minerals into two particular unnamed tributaries ("UTA" and "UTB") that reach two downstream bodies of water named Flat Creek and Haynes Creek. These dissolved mineral discharges are subject to Arkansas's water quality standards, which are developed by the Arkansas Department of Environmental Quality ("ADEQ"), adopted by the Arkansas Pollution Control and Ecology Commission ("APC&EC"), and ultimately approved by EPA. EPA acts as an enforcement agency to ensure that these standards are consistent with the Clean Water Act. Arkansas's water quality standards are enforced through a permitting program called the National Pollution Discharge Elimination System ("NPDES").

In June 2004, EDCC renewed its NPDES permit. The renewed permit, however, contained new, more stringent limits on EDCC's discharges of dissolved minerals. The permit provided for a three year compliance period, requiring compliance with the new limits by June 1, 2007. Unfortunately, EDCC has been unable to comply.

In November 2006, EDCC initiated a Third Party Rulemaking (the "Rulemaking") pursuant to the ADEQ's Continuing Planning Process[1] and Administrative Guidance Document in an effort to revise the dissolved minerals water quality criteria for UTA, UTB, and the downstream reaches of Flat Creek and Haynes Creek. In January 2008, after reviewing the Rulemaking, EPA notified EDCC that it was unable to take action because EDCC's proposal

---

[1] The Continuing Planning Process outlines the requirements for site specific changes to water quality standards. It also provides that when a requested change deals with dissolved minerals, the Administrative Guidance Document applies. The Administrative Guidance Document identifies the procedure and documentation required to support a site specific change to the dissolved mineral water quality standards.

failed to "provide adequate supporting documentation to demonstrate that the revised site specific criteria are appropriately protective."[2] In essence, EPA's initial response to EDCC's proposal was a request for more documentation showing that the revised water quality standards would adequately protect the designated uses of UTA, UTB, and Flat and Haynes Creeks.

Meanwhile, in June 2007, the designated compliance period set forth in EDCC's renewed NPDES permit expired. So, in June 2008, the ADEQ and EPA entered into a Consent Administrative Order to resolve EDCC's permit violations by setting interim limits for dissolved mineral discharges. The interim limits were to expire upon approval of EDCC's proposed Rulemaking, or December 31, 2009, whichever occurred first.

In August 2008, EDCC, through the ADEQ, provided EPA with additional documentation. According to EDCC, the initial and additional documentation together was substantially more comprehensive than what EPA had accepted and approved in prior third party rulemakings, such as in EPA's Record of Decision for *In re Bayou Meto Water Management District*, APC&EC Docket No. 07-004-R.[3] Nevertheless, in April 2009, EPA maintained that it was still unable to approve EDCC's Rulemaking for similar reasons stated in its January 2008 notice—it needed more documentation showing that the revised criteria would be adequately protective.[4]

Thereafter, the parties met on multiple occasions via telephone conference to identify additional documentation and testing and to develop a work plan that would provide the additional information that EPA needed. In September 2009, EDCC completed the work plan

---

[2] ECF No. 22; DORADO-000795. In simple terms, one of the aims of the Clean Water Act is to protect the designated uses—such as swimming, fishing, or aquatic life—of each body of water from impairment. *See* 40 C.F.R. § 131.6. In its January 2008 letter, EPA apparently believed that EDCC's proposal would not adequately protect the designated uses for UTA, UTB, and Flat and Haynes Creeks.
[3] ECF No. 21, Exhibit B, supplemented to the Administrative Record by EPA.
[4] ECF No. 22; DORADO-000811.

and supplemented its results to the ADEQ and EPA. In April 2010, EPA provided its comments on EDCC's supplemental information.

EPA found that the updated information provided more detail supporting the fact that discharges by EDCC may not affect aquatic life—a relevant designated use—of UTA and UTB.[5] However, EPA expressed concern for certain aquatic life impacts that EDCC's proposal would have on the downstream reaches of Flat Creek and Haynes Creek. Accordingly, EPA suggested certain steps that EDCC might take to eliminate that concern. For example, EPA suggested that EDCC could request that Arkansas perform a Use Attainability Analysis, which could result in a change to the designated use of the impacted bodies of water. Because EDCC believed those steps were not feasible, or otherwise out of its control, it took a different approach. Instead, EDCC requested that the Rulemaking be reopened, and it abandoned the part of the Rulemaking related to Flat Creek and Haynes Creek. It rescinded that portion of its proposal and limited the request to a revised water quality criterion for UTA and UTB only. EDCC apparently hoped this would compel approval since EPA had already suggested that EDCC's discharges may not impact aquatic life in UTA and UTB. EDCC was mistaken.

After EDCC resubmitted a revised Rulemaking, following the appropriate Continuing Planning Process ("CPP") and Administrative Guidance Document ("AGD") procedures for a second time, EPA again balked at the Rulemaking's potential downstream impacts on Flat Creek and Haynes Creek. On August 31, 2011, EPA issued its final decision declining to approve EDCC's Rulemaking. EPA stated several specific reasons for its decision in a Technical Support Document[6] including the following:

- EPA concluded that the revised criteria were not shown to be protective of either instream (UTA and UTB) or downstream (Flat and Haynes Creeks)

---

[5] ECF No. 23; DORADO-001684.
[6] ECF No. 38; DORADO-001895.

>
> designated uses, citing a lack of documentation showing that the revised criteria are protective of aquatic life and evidence of sub-lethal effects to reproduction in downstream waterbodies;
>
> - EPA concluded that the revised criteria may not provide for the attainment of the downstream minerals water quality criteria, noting that EDCC did not consider the downstream criteria in Flat and Haynes Creeks when calculating the revised criteria for UTA and UTB.
>
> - EPA concluded that the mass-balance equation used to derive the criteria is scientifically indefensible and failed to take into account important information.
>
> - EPA concluded that the weight of supporting evidence relied on by EDCC was flawed because it omitted relevant sources of information and because results of biological sampling, when compared to least-impacted reference streams (as opposed to impacted streams) in the Gulf Coast ecoregion, indicate impairment of biota.[7]

The Technical Support Document also rejected one of the main contentions that EDCC submitted in its supplemental report. EDCC had submitted that any impact on aquatic life in Flat and Haynes Creeks was not EDCC's fault, but instead, the result of legacy oil and gas activities from upper Flat Creek. EPA dismissed this contention because the study EDCC submitted failed to specifically identify other sources as the primary cause of impairment in upper Flat Creek. EPA therefore found unacceptable the cumulative effects that the dissolved mineral concentrations in UTA and UTB, in conjunction with the concentrations in upper Flat Creek, had on the downstream portions of Flat and Haynes Creeks.

Following EPA's final decision, EDCC filed this action seeking the Court's review. EDCC raises several objections as grounds for remand, requesting that the Court mandate that EPA approve its Rulemaking. First, EDCC claims that EPA's decision runs counter to the CPP, a procedural document prescribing the requirements for changes to site specific water quality criteria. Second, EDCC contends that the EPA decision was driven by improper motives. Third,

---

[7] ECF No. 40; DORADO001894-1895

EDCC objects to EPA's rejection of its "mass balance" approach,[8] arguing that such a ruling contradicts past EPA decisions finding the mass balance approach scientifically acceptable in numerous other third party rulemakings. Each of these objections must be reviewed through the lens of the Administrative Procedure Act ("APA").

## STANDARD OF REVIEW

Judicial review of administrative decisions is governed by the APA. 5 U.S.C. § 706. Under the APA, a court's review of an agency decision is limited. *Voyageurs Nat. Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004). A court is "only permitted to set aside agency action that is 'arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law.'" *Id.* An agency decision is considered arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Central South Dakota Co-op. Grazing Dist. v. Secretary of U.S. Dept. of Agriculture*, 266 F.3d 889, 895 (8th Cir. 2001) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

However, "[i]f an agency's determination is supportable on any rational basis," the reviewing court must uphold it. *Voyageurs Nat. Park Ass'n*, 381 F.3d at 763. In other words, the court "must affirm the Rule[making] if the record shows EPA considered all relevant factors and articulated a 'rational connection between the facts found and the choice made.'" *ATK Launch*

---

[8] The mass balance approach is a scientific method used by EDCC to evaluate the relevant bodies of water affected by its proposed Rulemaking. According to EPA, a mass balance analysis represents "an aquatic system through an accounting of mass entering and exiting the system. This analysis simplifies the representation of the waterbody and does not estimate or simulate detailed biological, chemical, or physical processes. It can, however, be a useful and simple way to estimate the allowable loading for a water body to meet water quality standards or other targets." ECF No. 42, n. 5 (citing *Handbook for Developing Watershed Plans to Restore and Protect Our Waters* (EPA 2008) at § 9.4.2, p. 9-7, available at "http://water.epa.gov/polwaste/nps/upload/2008_04_18_NPS_watershed_handbook_handbook.pdf."

*Systems, Inc. v. E.P.A.*, 669 F.3d 330, 336 (D.C. Cir. 2012) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). This is particularly true "when an agency is acting within its own sphere of expertise." *Id.* In such circumstances, agency decisions receive "a high degree of deference." *Sierra Club v. E.P.A.*, 252 F.3d 943, 947 (8th Cir. 2001). "This level of deference is especially appropriate in review of EPA's administration of the complicated provisions of the Clean Water Act." *ATK Launch Systems, Inc.*, 669 F.3d at 336. The court is to make a searching inquiry into the facts in the record, but it does not substitute its own judgment for that of the agency, "even if the evidence would have also supported [an] opposite conclusion." *South Dakota v. U.S. Dept. of Interior*, 423 F.3d 790, 799 (8th Cir. 2005).

## DISCUSSION

The proposed Rulemaking at issue in this case is subject to the Clean Water Act ("CWA"). The objective of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, section 303 of the Act provides a framework for establishing water quality standards and for reviewing and revising those standards. 33 U.S.C. § 1313.

Generally, "[s]tates are responsible for reviewing, establishing, and revising water quality standards." 40 C.F.R. § 131.4(a). States must do so in a manner that "protect[s] the public health or welfare, enhance[s] the quality of the water and serve[s] the purposes of the [CWA]." 33 U.S.C. § 1313(c)(2)(A). To achieve that end, states are required to establish "designated uses" of each body of water and develop water quality criteria to protect those uses. *Id*; 40 C.F.R. § 131.6. States must then submit those standards to EPA for review and approval before they become effective for purposes of the CWA. *Id.* The "EPA is given the final voice" in determining

whether a state's water quality standards adequately meet the CWA's requirements. *Mississippi Comm. on Natural Res. v. Costle*, 625 F.3d 1269, 1276 (5th Cir. 1980).

The same is true for proposed revisions to a state's water quality standards. 40 C.F.R. § 131.6(b). Each state must establish a continuing planning process ("CPP") that governs, among other things, the process for revising its water quality standards. 40 C.F.R. § 130.5(b)(6). The CPP, once established, must be reviewed and approved by EPA to ensure consistency with the CWA. 40 C.F.R. § 130.5(a). EPA's oversight, however, does not stop with its approval of a state's CPP. EPA reviews each proposed revision to a state's water quality standards submitted pursuant to the state's CPP. 40 C.F.R. § 131.5(a). This review process involves a determination of five things, two of which are of particular importance in this case because EPA cited them as justifications for its decision to decline EDCC's Rulemaking: (1) whether the revision has criteria that protects the designated uses of the state's waters; and (2) whether the revised standards are based upon appropriate technical and scientific data and analysis. *Id.*

EPA found that EDCC's revised criteria was not adequately protective of aquatic life in Flat and Hayne's Creeks, a designated use of those waters. EPA also found that the mass-balance equation used to derive EDCC's criteria was scientifically indefensible because it failed to take into account important information, such as stream flow conditions, results from properly conducted toxicity tests, downstream water quality standards, facility design flow capacity, and inputs from other point sources in the watershed.[9] EPA ultimately concluded that the weight of the evidence counseled against approving EDCC's Rulemaking for its failure to include relevant sources of information—e.g. an EDCC study from 1991, and results from biological sampling indicating impairment of biota in comparison to certain reference streams.

---

[9] DORADO-001895

These findings are entitled to deference. Pursuant to this Court's limited review under the APA, the EPA decision must be upheld unless EDCC can show that these finding were arbitrary, capricious, or inconsistent with the law.

EDCC argues that the decision is inconsistent with the law because it conflicts with the CPP, a document EPA had previously approved. EDCC also argues that the Rulemaking was arbitrarily denied because EPA had ulterior motives unrelated to the adequacy of the proposed Rulemaking. Finally, EDCC contends that the decision was arbitrary because EPA rejected its mass balance approach, an approach EPA has deemed acceptable and approved in numerous prior rulemakings.

### I. Consistency of the EPA Decision with the CPP

EDCC claims that once EPA approved Arkansas's CPP, it was required to follow it in reviewing the proposed rulemaking. In other words, EDCC contends that the CPP carries with it the force of law, and therefore, any EPA decision inconsistent with the CPP must be overturned.

EDCC argues that EPA's decision runs counter to the CPP for three reasons. First, it claims that the CPP does not permit consideration of data beyond the most recent five years, which EPA did in this case. Second, it contends that EPA violated the CPP by considering downstream impacts on bodies of water that were explicitly excluded by EDCC in its revised Rulemaking. Third, it maintains that the "weight of the evidence" approach applied by EPA to reject the Rulemaking is unprecedented.[10] EDCC argues that such an approach allowed EPA to ignore certain evidence in the administrative record and rely instead on evidence not required by the CPP.

---

[10] EPA's weight of the evidence approach included considerations beyond the bioassessments performed by EDCC upstream and downstream of its point source. EPA also considered historical data, whole-effluent toxicity data for Flat and Haynes Creeks, and other bioassessment data of UTA, UTB, and Flat Creek.

Through each of these arguments, EDCC indicates that a different outcome to the Rulemaking may have been plausible. But EDCC fails to demonstrate that EPA's decision was indeed irrational. Assuming without deciding that the CPP is binding on EPA's review of third party rulemakings, it appears the EPA decision is in accord with the CPP in this instance.

### a. EPA's Consideration of Data Beyond the Most Recent Five Years

The state of Arkansas has developed an Administrative Guidance Document ("AGD") to address changes to water quality criteria for specific stream segments, like the Rulemaking in this case. The AGD has been incorporated into the CPP.[11] This document requires that the party seeking a Rulemaking demonstrate that the existing aquatic life uses will be maintained in all relevant bodies of water.[12] The proponent of the Rulemaking must do so by submitting bioassessments collected within the last five years.[13]

In this case, EPA chose to consider data that was clearly outside of that five year period. EPA's Technical Support Document refers to data from studies as old as 1991.[14] EDCC argues that those studies are outdated and therefore were improperly considered. This contention, however, overlooks other important provisions in the AGD. The AGD also provides that bioassessment activities may include: (1) *historical data analysis*; (2) whole effluent toxicity testing; (3) benthic community sampling and analysis; and (4) fish collection analysis.[15] Therefore, any "outdated information" that EPA considered qualifies as historical data that the AGD expressly contemplates. Accordingly, the fact that EPA chose to consider, and require EDCC to supply, such data is not contrary to the CPP.

---

[11] DORADO-000197.
[12] DORADO-000197.
[13] DORADO-000197.
[14] DORADO-001895.
[15] DORADO-000198 (emphasis added).

### b. EPA's Consideration of Downstream Impacts on Bodies of Water Excluded from the Proposed Rulemaking

One of EPA's primary justifications for not approving EDCC's Rulemaking was the impacts on the downstream waters of Flat and Haynes Creeks. EDCC argues that EPA violated the CPP by considering those impacts because EDCC expressly excluded those two bodies from the revised Rulemaking it submitted to EPA.

This contention is unpersuasive because the CPP does not limit EPA review to the specific stream segments included in a proposed revision. The CPP expressly requires EDCC to demonstrate that existing aquatic life uses will be maintained "upstream and downstream of the point source."[16] Flat and Haynes Creeks are both downstream of UTA and UTB, the stream segments in EDCC's revised Rulemaking. Therefore, EDCC could not avoid consideration of those waters simply by rescinding them from its revised Rulemaking, and EPA did not act arbitrarily in finding the revised criteria not adequately protective of those waters.

### c. EPA's Weight of the Evidence Approach

EDCC suggests that the weight of the evidence approach applied by EPA is inherently arbitrary because it is not outlined in the CPP. EDCC also argues that it allowed EPA to overlook important evidence in the administrative record. This argument is unavailing.

As a practical matter, it is important to recognize what the weight of the evidence approach is. Put simply, it is EPA's method for evaluating, and determining the impact of, all the evidence in the administrative record. This method is essentially a scientific judgment that is entitled to "an extreme degree of deference." *ATK Launch Systems, Inc.*, 669 F.3d at 336. In view of that deference, the CPP at least implicitly anticipates a weight of the evidence approach for reviewing proposed revisions to water quality criteria. The CPP calls for an evaluation of

---

[16] DORADO-000198

bioassesstments upstream and downstream from the point source, historical data, whole effluent toxicity testing, benthic community sampling and analysis, and fish collection and analysis. Based on all of this data, EPA must determine whether existing aquatic life uses will be maintained if the Rulemaking is approved. Making that determination based on the weight of the evidence is certainly a rational approach to ensure consistency with the CWA.

After EPA considered EDCC's bioassessment data indicating impairments to UTA, UTB, and Flat Creek, historical data from a previous EDCC study, and whole-effluent toxicity data indicating impairments to aquatic life in Flat and Haynes Creeks, it determined that the Rulemaking was not adequately protective. The fact that there may have been some evidence in the record pointing to a different conclusion does not render EPA's decision arbitrary. EPA sufficiently articulated its rationale to EDCC for applying this approach. It stated that the approach was "necessary to show that the most sensitive uses are being protected by proposed criteria, especially for minerals criteria where protective concentrations can differ greatly from one geographic location to the next…."[17] Indeed, the CWA requires that EPA ensure the support of the water's most sensitive uses. 40 C.F.R. § 131.11(a)(1). Accordingly, the Court cannot substitute its own judgment for EPA's with respect to this finding.

## II. The Motives Driving EPA Decision

EDCC next contends that EPA's decision is arbitrary because it was derived from improper motives. EDCC, along with several other companies in El Dorado, Arkansas, is a party to an agreement that contemplates the discharge of its wastewater through a newly constructed pipeline. This pipeline project, however, is not yet completed. EDCC claims that its proposed Rulemaking was denied solely as a means to ensure EDCC's participation in the pipeline project, despite the fact that it has already committed to doing so. EDCC's belief that EPA possessed this

---

[17] DORADO-001893.

12

ulterior motive stems from an email sent by EPA during the approval process stating "I have concern about approving the rulemaking change when it appears the facilities' ultimate goal is to discharge via the pipeline."[18] EDCC argues that EPA was simply worried that EDCC might withdraw its support for the pipeline if the Rulemaking was approved, and thus, the basis for denying the Rulemaking was arbitrary.

As an initial matter, the comment by EPA expressing concern about EDCC's participation in the pipeline project does not, on its face, indicate that the unfinished pipeline was the sole motive for EPA's decision. Perhaps there is substantial evidence of such an improper motive if the Court were to look outside of the administrative record, but pursuant to the APA, the Court is not permitted to do so. *Florida Power & Light co. v. Lorion*, 470 U.S. 729, 743-44 (1985).

Furthermore, the Eighth Circuit has spoken directly on this issue. *Voyageurs Nat. Park Ass'n v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004). "Inquiry into the mental processes of administrative decisionmakers is to be avoided unless it is 'the only way there can be effective judicial review.'" *Id.* (internal citations omitted). In this case, consideration of EPA's mental impressions related to the pipeline is unnecessary because the agency has sufficiently articulated a legitimate rationale for its decision. In its Technical Support Document, EPA detailed several reasons for its decision unrelated to the pipeline, such as the aquatic life impacts in Flat and Hayne's Creeks. Therefore, any ulterior motive that EPA may have possessed cannot be considered based on the record before the Court.

### III. Scientific Defensibility of EDCC's Mass Balance Approach

Finally, EDCC takes issue with the fact that EPA rejected its "mass balance" approach for developing the criteria of the proposed Rulemaking. EPA found that EDCC's approach was

---

[18] ECF No. 23; DORADO-001616.

not scientifically defensible. EDCC claims that such a conclusion (a) contradicts numerous past EPA decisions that have rendered the mass balance approach scientifically acceptable in other third party rulemakings; and (b) ignores the fact that the CPP prescribes the mass balance approach as a method for supporting a revision to water quality criteria.

The Court's review of the CPP does not reveal any such requirement that requests for revisions be supported specifically by a mass balance approach. Therefore, the only remaining issue is whether EPA's prior rulings—finding the mass balance approach scientifically acceptable—are relevant in this case. The short answer is they are not.

An administrator is "free to adopt a new position if she [chooses], so long as she explain[s] the decision and it [is] not arbitrary or capricious." *Florida Wildlife Federation, Inc. v. Jackson*, 853. F.Supp. 2d 1138, 1158 (S.D. Fla. 2012) (citing *FCC v. Fox*, 556 U.S. 502 (2009)). As noted above, EPA has done that here. EPA has made clear that each request to revise water quality standards is based on the site specific data for that particular area because each geographic area is different.[19] In this instance, EPA found that EDCC's mass balance approach was insufficient, by itself, to protect the particular area in question, i.e. the designed uses of UTA, UTB, and Flat and Haynes Creeks. Furthermore, if EPA were bound by its prior approvals in other third party rulemakings, its obligation to ensure compliance with the CWA would be substantially undermined. *See Mississippi Comm. on Natural Res. v. Costle*, 625 F.3d 1269, 1277 (5th Cir. 1980). Accordingly, EPA's rejection of EDCC's mass balance approach was not arbitrary, capricious, or inconsistent with the law.

## CONCLUSION

For the reasons discussed above, the Court finds that Plaintiff El Dorado Chemical Company's Motion for Summary Judgment (ECF No. 21) should be and hereby is **DENIED**.

---

[19] DORADO-001876.

Defendants United States Environmental Protection Agency, Lisa P. Jackson, and Al Armendarez's Cross Motion for Summary Judgment (ECF No. 40) is **GRANTED**. A Judgment consistent with this opinion of shall issue. EPA's decision is **AFFIRMED**.

**IT IS SO ORDERED**, this 25th day of March, 2013.

/s/ Susan O. Hickey  
Susan O. Hickey  
United States District Judge